JONATHAN D. BLUM, ESQ.
Nevada Bar No. 9515
**WILEY PETERSEN**
1050 Indigo Drive, Suite 200B
Las Vegas, Nevada 89145
Telephone: 702.910.3329
Facsimile: 702.553.3467
jblum@wileypetersenlaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| FREE SPEECH FOUNDATION, INC., an Arizona Corporation, and DR. SIMONE GOLD, as President of FREE SPEECH FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> PHILADELPHIA INDEMNITY INSURANCE COMPANY, <br><br> Defendant. | CASE NO.: <br><br><br> **VERIFIED COMPLAINT** <br> **&** <br> **DEMAND FOR JURY TRIAL** |

Plaintiffs, Free Speech Foundation, Inc. ("AFLDS"), an Arizona Corporation, and Dr. Simone Gold, as President of AFLDS ("Gold" or "Dr. Gold") (collectively, "Plaintiffs"), by and through their attorneys, allege as follows:

### INTRODUCTION

This lawsuit is about a directors' and officers' insurance policy gone wrong. In 2022 a battle for control of the AFLDS occurred. At one point there were two competing boards of directors making allegations of impropriety against each other. One group of directors were the corporation's legal management that actually ran the company day-to-day. The other set of directors was a fraud; although it included two former directors it rapidly spiraled into a brand-new group of dupes and crooks who looted several corporate bank accounts, and never managed anything, causing enormous damage to AFLDS.

The fraudulent group of alleged directors made a claim for legal coverage under AFLDS's directors' and officers' policy to Philadelphia Indemnity Insurance Co. ("PICO" or Defendant), which

failed to do reasonable (or perhaps any) diligence to make sure it was supporting the correct group of alleged managers. The simplest inquiry would have shown PICO and its lawyers that the persons purporting to access the policy had no connections to the actual organization apart from silly claims to have elected each other during telephone calls.

Instead of being reasonably prudent, PICO paid for the fraudulent board's lawyers, and mayhem ensued as the lawyers attempted to further the fraudulent actors' purposes until it became undeniably obvious there was no legitimate "outside board" as the baton of alleged authority passed further away to increasingly more suspect characters. At that point, as its so-called clients kept disappearing and being replaced, PICO had another chance to stop the damage and do the right thing.

Instead, it did the worst thing it could possibly have done. It began to direct its lawyers to cover up its mistakes by litigation in what it —PICO— believed would be in PICO's best interest, all the while steadfastly refusing to engage with the Plaintiff's legal managers who did everything they could think of to get PICO's attention. At another point, AFLDS's real managers begged PICO to provide them with lawyers as well, as they were required to do under PICO's insurance policy, but PICO refused.

PICO facilitated identity fraud and theft: acting as though a foreign party was their insured and when this was repeatedly brought to their attention, they failed to correct their actions and instead took actions to cover up their own negligence. PICO's efforts to cover up the fact it imprudently bet on the wrong group of alleged managers made the situation infinitely worse, wrecked Plaintiff's reputation and goodwill, slashed essential donations, emboldened bad actors, and created rancor and confusion. Millions of dollars were lost.

And this lawsuit ensued.

## PARTIES AND JURISDICTION

1.     Plaintiff AFLDS is a corporation organized under the laws of the State of Arizona.

2.     Plaintiff Dr. Simone Gold is a resident of the State of Florida and the President and Chairman of the Board of AFLDS.

3.     AFLDS is a 501(c)(3) charitable organization devoted to advancing medical freedom. Critically, AFLDS depends entirely on its goodwill and good reputation, as it is supported by generous

1    donors who believe in its mission.

2        4.    PICO is a Pennsylvania corporation with its principal place of business in Bala

3    Cynwyd, Pennsylvania.

4        5.    The Court has jurisdiction over this action under 28 U.S.C. § 1332(a) as the parties are

5    citizens of different states and the amount in controversy exceeds $75,000.

6        6.    Venue is proper in this District under 28 U.S.C. § 1391(b) as the policy was issued by

7    PICO to Plaintiffs in this District, and its terms are governed by Nevada law.

8                                    **FACTUAL ALLEGATIONS**

9        7.    PICO issued two "Flexi Plus Five" insurance contracts to AFLDS, policy numbers

10    PHSD1684378 (covering January 3, 2022 to January 3, 2023) and PHSD1759053 (covering January

11    3, 2023 to January 3, 2024). Together, the two consecutive, materially-similar policies will be referred

12    to in the singular as the "Policy."

13        8.    The Policy was issued in Nevada. PICO stated in a July 6th, 2023 letter that the Policy

14    would be interpreted under Nevada law. The Policy includes provisions specific to the State of Nevada.

15        9.    Nevada is a dual representation state, where insurer-appointed defense counsel has two

16    clients: the policyholder defendant and the liability insurer. Under Nevada law, the appointed defense

17    attorney represents both the policyholder and the insurer.

18        10.    But, under Nevada law, policyholders are entitled to independent defense counsel at

19    the insurer's expense when the insurer's reservation of rights or other circumstances create an actual

20    conflict of interest for defense counsel.

21        11.    Because Nevada is a dual-representation state, defense counsel may not represent both

22    the insurer and the insured when their interests conflict and no special exception applies.

23        12.    There is no special rule for insurers that caps their liability at the policy limits for a

24    breach of the duty to defend. *Andrew v. Century Sur. Co.*, 134 F. Supp. 3d 1249, 1259 (D. Nev. 2015).

25        13.    An insurer's liability for breach of duty to defend is not capped at policy limits,

26    regardless of whether such breach was in bad faith.

27        14.    When an actual conflict of interest exists between an insurer defending its insured under

28    a reservation of rights to determine coverage and the insured, the insurer is required to satisfy its

contractual duty to provide representation by permitting the insured to select independent counsel and by paying the reasonable costs of such counsel. *State Farm Mut. Auto. Ins. Co. v. Hansen*, 131 Nev. 743, 357 P.3d 338 (2015).

15.     In 2022 and early 2023, AFLDS experienced a battle for control of the corporation. As a result, a lawsuit was filed in Arizona (Maricopa County Case No. CV2022-015525) (the "Arizona Action") between competing sets of individuals who claimed to be the proper directors. Director Gold sued Directors Mack, Gilbert, and Matthesius.

16.     Director Gilbert filed a claim with PICO and PICO hired the Metzger Law Firm ("Metzger") to defend Mack, Gilbert and Matthesius.

17.     PICO made a mistake and has continued to compound that error. For reasons known only to it, before providing defense coverage, PICO did not perform a reasonable investigation but merely "picked" a side in an internal corporate dispute.

18.     PICO had plenty of reason to doubt that it had picked the right set of directors. For example, PICO's attorneys were never authorized by any legitimate AFLDS Board vote. Regardless, PICO's obligations were not to pick a side, but do provide a defense for its insureds, including separate counsel in the event of conflict.

19.     Curiously, neither PICO nor its hired defense attorneys ever interviewed the Members of the Board, or any member of AFLDS's Executive Leadership Team, or any AFLDS employee at all, or even any of the attorneys who previously litigated for AFLDS, despite being aware of the nature of the claims at issue.

20.     Since it hired the Metzger firm, PICO has continued to act in bad faith by continuing to fail to reasonably investigate who the proper AFLDS managers are, and in failing to do so, have betrayed its own client and breached its duties to its insured.

21.     In early 2023, while participating in the Arizona Litigation's Preliminary Injunction hearing, one of the three defendants (Mack) became aware of financial malfeasance and other misdeeds by his co-defendants Gilbert and Matthesius.

22.     At that time, Defendant Mack reversed his position and joined Plaintiff Gold, which should have been another red flag for PICO and its defense attorneys.

4

23.    In March 2023 all the defendants' attorneys (from multiple law firms), other than Metzger, quit.[1] This should have been another red flag for PICO.

24.    On March 31, 2023, Arizona Action defendants Joey Gilbert and Jurgen Matthesius formally resigned as directors of AFLDS. This should have been another red flag for PICO.

25.    Gilbert and Matthesius' resignations on March 31, 2023, combined with Richard Mack's prior dismissal from the Arizona Action should have mooted the Arizona Action. After all, the issue plaintiff initially brought before the Court: removal of the defendant Board members (for financial malfeasance) had been resolved.

26.    The case could have been dismissed at this time but for PICO's unaccountable continued interference. AFLDS attorneys made several attempts to encourage PICO and its masterless defense attorneys to cease "representing" AFLDS because it had no reasonably legitimate client representative.

27.    Instead, PICO made decisions as though it were the client, AFLDS. Its decisions, by and through its hand-picked lawyer, were in direct conflict with the interests of AFLDS, and are/were destructive and damaging, not least because it has never spoken to an AFLDS employee and has no idea what is going on in the business.

28.    AFLDS repeatedly asked PICO to cease and desist and attempted to obtain coverage for Gold and AFLDS. For example, AFLDS provided notice to PICO on May 19, 2023 via email:[2]

//

//

//

//

_____

[1] There was extensive evidence submitted during the Arizona Action's Preliminary Injunction hearing that demonstrated severe financial abuse by Defendant Gilbert. There was extensive evidence that Defendant Gilbert misled his own attorneys. Three distinct law firms all independently quit. PICO received all of this evidence at the time, by and through its attorneys.

[2] Months later, PICO would claim that it (invisibly) denied coverage because Dr. Gold did not timely notice her claim. Not only was this rationale raised ex post facto, but PICO was well aware of the dispute the entire time, and it is disingenuous for PICO to pretend to have been prejudiced by lack of notice.

**From:** Jose Jimenez <Jose@JimenezIPLaw.com>
**Sent:** Friday, May 19, 2023 1:35:26 PM
**To:** Patrick.Farrell@phly.com <Patrick.Farrell@phly.com>; michael.goodman@phly.com <michael.goodman@phly.com>
**Subject:** Insurance Claim – Policy No. 122406 - Philadelphia Indemnity

Dear Sirs,

Our firm represents Dr. Simone Gold, who President and Chairman of the Board of the Free Speech Foundation d/b/a as America's Frontline Doctors (AFLDS).

Dr. Gold is hereby making a claim on an individual basis and on behalf of AFLDS on the above policy, on all coverages and policies that apply to the claims made against her and the claims she has made against others.

We request an immediate investigation, defense, and indemnity on this claim. Time is of the essence in this matter, especially given Philadelphia Indemnity Insurance Company's improper assistance of others in a current dispute. Please see the attached letter for further details.

Please contact the undersigned should you have any questions.

Very truly yours,

*/s/ Jose W. Jimenez, Esq.*

Jose W. Jimenez, Esq.

29.     PICO's agent, Patrick Farrell, acknowledged notice on May 24, 2023, and thereafter also did PICO's claim department on June 5, 2023.

30.     PICO is in breach of its contractual obligation to its client, AFLDS.

31.     PICO is in breach of its contractual obligation to Dr. Gold.

32.     PICO is in breach of its fiduciary duty to its client, AFLDS.

33.     PICO is in breach of its fiduciary duty to Dr. Gold.

34.     PICO's defense attorneys are in breach of their fiduciary duties to their client, AFLDS.

35.     Before, during, and following Gilbert and Matthesius' resignations, Director Mack continued his regular Board duties.[3]  Through the present day, the AFLDS Board of Directors has continued to hold regular meetings, and the organization with its 40 workers has continued to function as usual, under Dr. Gold's direction as President.

36.     Gilbert and Matthesius' final act before resigning was to round up three persons with no connection to AFLDS and attempt to appoint these three random persons to the AFLDS Board. These three are described herein as the "Fake Board."

---

[3] At the first Board meeting he convened following the others' resignation, Mack appointed Gold to the Board. Dr. Gold has always held that she has always been a member of the Board. However, in an abundance of caution, Director Mack formally nominated Dr. Gold to the Board, and Dr. Gold accepted. (While maintaining her ongoing position that such a nomination was redundant.)

37.    Within about six weeks, all three members of the Fake Board had resigned. Two of the three resigned after learning they were being used to effectuate fraud by an intermeddler named Kevin Jenkins, and the third resigned due to personal bankruptcy.

38.    Two of the three Fake Board members have since made written declarations as to the severe fraud they directly observed. Those written statements were made available to PICO, who unfathomably ignored them.

39.    At all times, the Fake Board operated outside AFLDS, with no connection to AFLDS, and without AFLDS's knowledge (which was still functioning normally).

40.    Even after defendant Gilbert and Matthesius' resignations, and after defendant Mack's side-switching to join the plaintiff, and after the Fake Board's rapid meltdown, and after public statements made by two of the Fake Board's resigned members that the fraud was occurring, neither PICO or its defense attorneys ever contacted the AFLDS Board, the AFLDS Executive Leadership team, any AFLDS employee, or even AFLDS' attorney — who had been pleading with them to listen — to gain a better understanding of the facts.

41.    In violation of professional ethical rules which *require* consultation with the client, PICO's defense attorneys began taking direction solely from PICO's claims representative on matters applying specifically to AFLDS (not PICO), evidencing PICO's defense attorneys' bad faith failure to reasonably investigate the facts, correct its profound mistake, and mitigate the damages caused by the betrayal of its client, AFLDS.

42.    In June, 2023, PICO filed an *Application to Appoint Receiver* for AFLDS in the Arizona Action, stating as partial rationale that it — PICO — could not determine who was managing the corporation.

43.    This was a bald-faced lie.

44.    Although PICO's Fake Board had trickled away in disgrace, PICO knew full well who was running AFLDS, who had been running AFLDS the whole time, and who had been screaming from the rooftops that they were the correct AFLDS authorities.

45.    But instead of admitting its error, PICO doubled down, and lied to the Arizona Court, feigning ignorance, claiming it simply couldn't tell who the proper authorities were.

46.    And then —just to cover up its mistake — PICO moved to replace AFLDS's proper managers with a receiver. PICO had no business advocating to replace the management of its own client by directing its attorneys, who allegedly also represented AFLDS, to seek a receiver.

47.    PICO's efforts to undermine AFLDS's actual management and insert a third-party receiver, where none was warranted, needed or appropriate, badly damaged AFLDS on a multimillion-dollar scale.

48.    Already suspicious, AFLDS learned for certain that PICO was actively working against it in bad faith when it unilaterally moved for the appointment of a corporate receiver — without even consulting a single employee at the firm.

49.    If it weren't obvious before, at that point, the interests of PICO and AFLDS had completely diverged into direct conflict, as PICO was now working in direct opposition to its own insured, for its own benefit, and its own purposes.

50.    After the wayward board members resigned, and after the Fake Board imploded, AFLDS rightfully expected the litigation to end. But its insurance company, the company to which it paid thousands of dollars in premiums *for protection*, was instead pursuing a reckless attack on its own insured simply to avoid embarrassment and liability for its own mistake in backing the wrong set of managers from the outset.

51.    PICO had a contractual duty to follow its insured's directions. When PICO's (improper) client representatives disappeared, it should have immediately started taking direction from the only remaining viable group of directors, and stopped defending the case when asked to do so. Yet PICO has obstinately refused to do so.

52.    Additionally, PICO had a contractual duty to hire separate defense counsel for AFLDS's lawful managers, but refused upon demand to do so.

53.    In June, 2023, PICO directed the Metzger Firm to file various motions, including the motion to appoint a receiver for AFLDS, and a motion to prevent Dr. Gold — AFLDS's rightful President — from participating in the litigation. These motions were part of a scheme to protect PICO's interests in two ways, one by saving money on attorneys' fees at the cost of enormous damage to AFLDS. And to cover up its ongoing negligence and past mistakes by dis-empowering the AFLDS

leadership team.

54.    PICO has fiduciary duties to, and assumed a special fiduciary relationship with, AFLDS, not just by paying for defense counsel (for the wrong managers), but by assuming sole direction of the Metzger Firm lawyers after the Fake Board collapsed, ordering the lawyers to take affirmative actions — not just defending its client — in the Arizona Action, including seeking appointment of a receiver.

55.    The subsequent actions by PICO, through the Metzger lawyers, damaged AFLDS's reputation and caused its donations to drastically decrease.

56.    Beginning around the same time that PICO assumed control of the Arizona Litigation, AFLDS and Dr. Gold began to suffer extraordinary damages, and incurred substantial expenditures in the form of attorneys' fees and costs, reputational harms, and a significant drop-off in donations — all as a result of PICO's actions.

57.    PICO:

    a)  failed to do necessary diligence before it picked the wrong group of managers,

    b)  failed to provide a legal defense to other managers, as it was required to do,

    c)  quickly became aware it had picked the wrong managers, and,

    d)  knew of the Fake Board's fraudulent activities as soon as PICO assumed control of the Arizona Action.

### The Jenkins Fraud

58.    Absent the Arizona Action that was entirely fueled and supported by PICO, Kevin Jenkins would never have been able to conduct his fraudulent scheme to steal AFLDS's corporate identity and its assets.

59.    PICO failed to conduct even minimal due diligence to verify Jenkins' claim of authority.

60.    Kevin Jenkins conceived a scheme to loot millions from AFLDS's treasury (the "Jenkins Fraud"). After all of the Wayward Directors (Gilbert and Matthesius) and the Fake Board Members had resigned, the case was over and would have been dismissed *but for* PICO's fraud on the Court that there remained a live case. PICO gave credibility to Jenkins, who took the moment that

there was of a "judicial pause" to name himself AFLDS' CEO, hired an attorney using stolen AFLDS money, and the pair undertook a cross-country crime spree visiting AFLDS bank locations posing as AFLDS's CEO and attempting to empty AFLDS's bank accounts. Some branches detected the fraud and refused, but Jenkins stole $400,000 or more in AFLDS funds.

61.    Since then, Jenkins has publicly appeared in YouTube videos and other online venues, with his lawyer at his side, pretending to be AFLDS' "CEO in exile," claiming to be righting wrongs and standing up for donors. The truth is Jenkins never was CEO of anything.[4]

62.    None of AFLDS's 40 employees ever took direction from Jenkins or even know who he is. He's never done a day's work at AFLDS. He has no connection to AFLDS whatsoever. The most cursory review would instantly reveal Jenkins' lack of any connection to AFLDS. PICO knew or should have known Jenkins had no legitimate connection to AFLDS.

63.    Jenkins' claim to be CEO was a ruse to justify paying himself an exorbitant salary from the stolen AFLDS funds. To continue the pretext, Jenkins and his lawyer filed two frivolous lawsuits against AFLDS's real CEO, Dr. Simone Gold, and both lawsuits were properly and promptly dismissed for lack of standing or lack of authority.

64.    In other words, two courts quickly saw through Jenkins' scheme, but for some reason PICO was always unable to tell.

65.    Jenkins had absolutely no corporate indicia. He did not appear anywhere on the enormous AFLDS website. He did not work for the organization. He did not have an email address from the organization. He did not appear on the organizations' social media. Simultaneously there were detailed articles published about Jenkins' cons and frauds.

66.    At all times, PICO was in close contact with Jenkins and/or his attorney and was aware of his actions and the fraudulent scheme. PICO chose to support Jenkins in order to continue its charade that it had originally picked the correct set of managers and had not in fact made an egregious and ongoing error.

//

_____

[4] Jenkins has a colorful public records history that should have immediately raised red flags for PICO, who was provided this information.

67.    PICO's continued prosecution of the Arizona Action after Gilbert and Matthesius resigned created the opportunity for Jenkins to effectuate his fraudulent scheme to steal AFLDS funds and defraud donors. Absent PICO's improper funding and direction of the Arizona Action, the Jenkins Fraud would have been impossible.

68.    AFLDS several times notified PICO of the ongoing Jenkins Fraud but PICO refused to take any action to stop the ongoing damages to its own insured, AFLDS.

69.    On May 19, 2023, well after PICO took over control of the Arizona Action, Dr. Gold, by and through her attorneys, sent a letter to PICO informing PICO of the ongoing fraud and corporate identity theft caused by Jenkins and giving PICO notice of its failure to conduct proper due diligence on the parties to be covered. However, PICO ignored the May 19th letter.

70.    On June 21, 2023, AFLDS sent PICO another letter on behalf of the organization and Dr. Gold, which demanded that PICO provide coverage in the Arizona Action, and again notifying PICO of the ongoing fraud.

71.    Once again, PICO ignored AFLDS's June 21st letter, responding only to the demand for coverage (which it refused) and ignoring the information provided by AFLDS about the Jenkins Fraud.

72.    PICO ignored the Jenkins Fraud because it decided it could not reverse course and acknowledge that it had originally picked the incorrect set of directors, and failed to defend the other set.

73.    AFLDS told PICO again and again that what it and its lawyers were doing was wrong, and that it was harming AFLDS, but PICO would not listen. PICO continues to actively aid and abet the Jenkins Fraud. There is a gas pump that is still running, spilling gas. The damages are ongoing. PICO is *right now,* in *real time*, running the gas pump, draining the gas, spilling it on the ground. AFLDS funds continue being drained with the assistance and cover of PICO. The attorney PICO appointed, Metzger, on behalf of rogue elements including the fraudster Jenkins, is thus assisting the fraud. All damages from the moment PICO failed to listen to its insured AFLDS and assigned an attorney to aid a known fraudster - the real costs and the reputational damage and loss of fundraising – PICO is liable for these damages.

74.   In other words, the damages are continuing.

75.   Plaintiffs have been required to retain an attorney and incur attorney's fees and costs due to the actions of Defendant PICO.

## First Cause of Action

## Aiding and Abetting a Tort

76.   The allegations pleaded in paragraphs 1-75 are incorporated herein.

77.   A primary tortfeasor, Jenkins, committed torts against Plaintiffs, including by the Jenkins Fraud.

78.   Such torts include, but are not limited to, conversion, fraud, civil conspiracy, misappropriation, and negligence.

79.   PICO knew that Jenkins' conduct was a breach of duty.

80.   PICO intentionally and substantially assisted and/or encouraged Jenkins' conduct in committing the tort(s).

81.   PICO's actions and inactions caused damages to Plaintiffs.

82.   As a direct, proximate, and foreseeable result of PICO's acts, Plaintiffs have been damaged in excess of $75,000, and in an amount to be determined at the time of trial.

83.   Defendant's acts were committed with fraud, oppression, and/or malice, entitling Plaintiffs to punitive damages pursuant to NRS 42.005 in an amount to be determined at the time of trial.

84.   As a direct, proximate and foreseeable result of the Defendant's acts, it has become necessary for Plaintiffs to secure the services of an attorney, and Plaintiffs are entitled to recover fees and costs incurred herein as damages.

## Second Cause of Action

## Violations of NAC 686A.665

85.   The allegations pleaded in paragraphs 1-84 are incorporated herein.

86.   PICO received a notice of a claim from Plaintiffs on or about May 19, 2023, though it was aware of the claim long before that.

87.   PICO failed to acknowledge receipt of the claim within 20 working days as required

12

1   under NAC 686A.665(1).

2       88.     Plaintiffs made other pertinent communications to PICO which reasonably suggested

3   that a response was expected.

4       89.     However, PICO failed to provide appropriate replies thereto within 20 working days as

5   required under NAC 686A.665(3).

6       90.     PICO also failed to comply with NAC 686A.665(4) by providing necessary claim

7   forms, instructions and reasonable assistance.

8       91.     As a direct, proximate, and foreseeable result of PICO's acts, Plaintiffs have been

9   damaged in excess of $75,000, and in an amount to be determined at the time of trial.

10      92.     Defendant's acts were committed with fraud, oppression, and/or malice, entitling

11  Plaintiffs to punitive damages pursuant to NRS 42.005 in an amount to be determined at the time of

12  trial.

13      93.     As a direct, proximate and foreseeable result of the Defendant's acts, it has become

14  necessary for Plaintiffs to secure the services of an attorney, and Plaintiffs are entitled to recover fees

15  and costs incurred herein as damages.

### Third and Fourth Causes of Action

### Contractual and Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing

18      94.     The allegations pleaded in paragraphs 1-93 are incorporated herein.

19      95.     Plaintiff and PICO entered valid, enforceable insurance contracts, referred to herein

20  collectively as the Policy.

21      96.     All contracts within the State of Nevada contain an implied covenant of good faith and

22  fair dealing.

23      97.     Plaintiffs and PICO enjoyed a special relationship of trust, that of an insurer and

24  insured.

25      98.     Plaintiffs had a justified and reasonable expectation to receive certain benefits from the

26  Policy between Plaintiffs and PICO, including, but not limited to, a legal defense in the Arizona

27  Litigation, and the right to participate in its own defense through its authorized representatives.

28  //

99.     PICO performed under the Policy in such a manner that it was unfaithful to the purposes of the agreement, including, but not limited to, not providing a defense to Plaintiffs, not investigating the factual issues surrounding the Arizona Litigation, pursuing its own agenda in the Arizona Litigation, among other improper conduct.

100.    PICO had no reasonable basis for disputing coverage and/or for providing a defense to Plaintiffs.

101.    PICO knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage and/or for providing a defense to Plaintiffs.

102.    PICO breached the covenant of good faith and fair dealing.

103.    PICO's unfaithful actions were deliberate.

104.    As a direct, proximate, and foreseeable result of PICO's acts, Plaintiffs have been damaged in excess of $75,000, and in an amount to be determined at the time of trial.

105.    Defendant's acts were committed with fraud, oppression, and/or malice, entitling Plaintiffs to punitive damages pursuant to NRS 42.005 in an amount to be determined at the time of trial.

106.    As a direct, proximate and foreseeable result of the Defendant's acts, it has become necessary for Plaintiffs to secure the services of an attorney, and Plaintiffs are entitled to recover fees and costs incurred herein as damages.

## Fifth Cause of Action

## Breach of Fiduciary Duty

107.    The allegations pleaded in paragraphs 1-106 are incorporated herein.

108.    Defendant was at all times relevant hereto a fiduciary to Plaintiffs, and owed them fiduciary duties.

109.    Defendant breached its fiduciary duties to Plaintiffs.

110.    After Gilbert and Matthesius resigned, PICO took over, acting as unauthorized proxy directors, and began instructing Metzger.

111.    By undertaking to direct AFLDS's attorneys on critical matters for AFLDS's behalf, PICO assumed a special fiduciary duty to AFLDS.

14

112.    Defendant breached its fiduciary duty to Plaintiff by failing to act with the utmost faith to Plaintiffs, including, but not limited to, seeking the appointment of a receiver of AFLDS.

113.    PICO, directly and by and through its agents, including Metzger, intentionally and substantially assisted or encouraged conduct that violated their fiduciary duties to AFLDS.

114.    As a direct result of PICO's breach of fiduciary duty, AFLDS has been damaged in an amount in excess of $75,000, and in an amount to be determined at the time of trial.

115.    Defendant's acts were committed with fraud, oppression, and/or malice, entitling Plaintiffs to punitive damages pursuant to NRS 42.005 in an amount to be determined at the time of trial.

116.    As a direct, proximate and foreseeable result of the Defendant's acts, it has become necessary for Plaintiffs to secure the services of an attorney, and Plaintiffs are entitled to recover fees and costs incurred herein as damages.

**Sixth Cause of Action**

**Breach of Contract**

117.    The allegations pleaded in paragraphs 1-116 are incorporated herein.

118.    The Policy provides that PICO will provide a defense *for AFLDS.*

119.    But when notified of AFLDS's express wishes to stop defending the organization, because its selected insurance defense lawyers were causing more harm than good, PICO willfully and intentionally refused to honor its obligations under the contract.

120.    Plaintiff AFLDS had the right to provide direction to the attorney appointed by PICO to defend it, and it had the right not to have conflicted defense counsel who were actively harming the organization.

121.    PICO breached the insurance Policy.

122.    PICO essentially facilitated identify theft: acting as though a foreign party was their insured, and when this was repeatedly called to their attention, they failed to correct their actions.

123.    PICO, directly and by and through its agents, including Metzger, intentionally and substantially assisted or encouraged conduct that breached their contractual duties to AFLDS.

124.    As a direct, proximate, and foreseeable result of PICO's breaches, Plaintiffs have been

1 | damaged in excess of $75,000, and in an amount to be determined at the time of trial.

2 | 125. As a direct, proximate and foreseeable result of the Defendant's acts, it has become

3 | necessary for Plaintiffs to secure the services of an attorney, and Plaintiffs are entitled to recover fees

4 | and costs incurred herein as damages.

### Seventh Cause of Action

### Negligence/ Negligent Supervision

7 | 126. The allegations pleaded in paragraphs 1-125 are incorporated herein.

8 | 127. After the resignations of Gilbert and Matthesius in March, 2023, PICO had a duty to

9 | use due care in supervising its selected attorneys in a way that did not harm AFLDS.

10 | 128. PICO failed to supervise its selected attorneys with due care in a way that did not harm

11 | AFLDS, constituting a breach of that duty.

12 | 129. As a direct, proximate and foreseeable result, PICO caused damages to AFLDS,

13 | including but not limited to, expenditure of unnecessary legal fees and costs, reputational harms, and

14 | a significant drop-off in donations.

15 | 130. As a direct result of PICO's negligence and negligent failure to supervise the attorneys

16 | it selected and was paying, Plaintiffs have been damaged more than $75,000, and in an amount to be

17 | determined at the time of trial.

18 | 131. As a direct, proximate and foreseeable result of the Defendant's acts, it has become

19 | necessary for Plaintiffs to secure the services of an attorney, and Plaintiffs are entitled to recover fees

20 | and costs incurred herein as damages.

### Eighth Cause of Action

### Temporary and Permanent Injunction

23 | 132. The allegations pleaded in paragraphs 1-131 are incorporated herein.

24 | 133. Plaintiff is likely to prevail on the merits. The Fake Board is gone and the Policy terms

25 | are clear.

26 | 134. The Arizona Action is causing irreparable harm to Plaintiff.

27 | 135. Compensatory damages would be insufficient.

28 | 136. Defendant PICO has no legal right to seek a receiver for Plaintiff.

16

137.    Plaintiff has a clear legal right to prevent PICO from defrauding the Arizona court into thinking PICO's lawyers represent AFLDS.

138.    Enjoining PICO from continuing its harmful crusade against AFLDS to avoid embarrassment will not harm PICO at all in any legally cognizable way.

139.    The public benefits when courts prevent insurers from employing conflicted attorneys that harm insureds.

140.    The Metzger Firm is hopelessly conflicted between its tripartite duty to PICO and its duty to AFLDS.

141.    Plaintiff seeks a temporary and permanent injunction barring PICO from advancing or continuing any litigation ostensibly on behalf of ALFDS.

142.    As a direct, proximate and foreseeable result of the Defendant's acts, it has become necessary for Plaintiffs to secure the services of an attorney, and Plaintiffs are entitled to recover fees and costs incurred herein as damages.

## Ninth Cause of Action

## Declaratory Relief pursuant to 28 US Code § 2201 and/or NRS 30.030 et seq.

143.    The allegations pleaded in paragraphs 1-142 are incorporated herein.

144.    Plaintiff and Defendant entered into valid and enforceable contracts.

145.    A dispute exists between Plaintiffs and Defendant as to the interpretation of the agreements, including but not limited to, Defendant's obligation to provide a defense to Plaintiffs.

146.    Plaintiffs are entitled to a declaration pursuant to NRS 30.030 et seq. setting forth the rights, obligations and duties of the parties to the contracts.

147.    Plaintiffs are entitled to a declaration that:

    a.  Plaintiffs are entitled to a defense in the Arizona action under the Policies.

    b.  The Metzger Firm cannot represent AFLDS without a proper AFLDS representative with authority directing and/or providing input on the representation.

    c.  The Metzger Firm cannot seek appointment of a receiver without a proper AFLDS representative with authority directing and/or providing input on this

course of action.

148.　As a direct, proximate and foreseeable result of the Defendant's acts, it has become necessary for Plaintiffs to secure the services of an attorney, and Plaintiffs are entitled to recover fees and costs incurred herein as damages.

**PRAYER FOR RELIEF**

1.　Judgment in favor of Plaintiffs and against Defendant, in an amount in excess of $75,000, according to proof;

2.　For temporary, preliminary, and permanent injunctive relief barring PICO, the insurance company, whether individually or through its retained counsel, from advancing or continuing any litigation ostensibly on behalf of its insured, ALFDS in the absence of input and direction from its rightful representatives;

3.　For an award of reasonable attorneys' fees and costs incurred in bringing this action;

4.　For an award of exemplary and/or punitive damages;

5.　For an award of pre- and post- judgment interest at the highest rate allowed by law until the judgment is fully paid; and,

6.　For any further relief the Court deems just and proper.

DATED this 8th day of September, 2023.

**WILEY PETERSEN**

JONATHAN D. BLUM, ESQ.
Nevada Bar No. 9515
1050 Indigo Dr., Suite 200B
Las Vegas, Nevada 89145
Telephone: 702.910.3329
Facsimile: 702.553.3467
jblum@wileypetersenlaw.com

*Attorneys for Plaintiffs*

18

## JURY TRIAL DEMAND

Pursuant to FRCP 38, Plaintiffs demand a trial by jury as to all issues so triable.

DATED this ___ September, 2023.

**WILEY PETERSEN**

JONATHAN D. BLUM, ESQ.
Nevada Bar No. 9515
1050 Indigo Dr., Suite 200B
Las Vegas, Nevada 89145
Telephone: 702.910.3329
Facsimile: 702.553.3467
jblum@wileypetersenlaw.com

*Attorneys for Plaintiffs*

## VERIFICATION

Under penalties of perjury, the undersigned declares that she is the Plaintiff named in the foregoing Complaint and knows the contents thereof; that the pleading is true of her own knowledge, except as to those matters stated on information and belief, and that as to such matters she believes it to be true.

09 / 08 / 2023
DATED this ___ September, 2023.

SIMONE GOLD

Dr. Simone Gold, President, AFLDS

19

Doc ID: 2ba0fee63315b2405e2a7440622a50dec3bb69fb