UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| FREE SPEECH FOUNDATION, INC., *et. al.* | Case No. 2:23-cv-01407-MMD-BNW |
| Plaintiffs, | ORDER |
| v. | |
| PHILADELPHIA INDEMNITY INSURANCE CO., | |
| Defendant. | |

## I.    SUMMARY

This is a directors' and officers' insurance coverage action arising from an underlying dispute over control of the board of directors of Free Speech Foundation, Inc., d/b/a America's Frontline Doctors, Inc. ("AFLDS"). (ECF No. 1 ("Complaint").) AFLDS, an Arizona nonprofit corporation founded by Dr. Simone Gold, has been embroiled in an ongoing battle over its leadership since 2022, with two competing boards of directors each accusing the other of fraud and impropriety. (*Id.*) Formal control of AFLDS is at issue in litigation pending in Arizona state court. (*Id.* at 4.) In this federal action, Plaintiffs are Dr. Gold "as president of [AFLDS]" and AFLDS in its organizational capacity.[1] (*Id.* at 1.) Plaintiffs bring nine contract, tort, and statutory claims against Defendant Philadelphia Indemnity Insurance Company ("PIIC"), which has provided a plan of directors' and officers' insurance coverage to AFLDS. (*Id.*) Plaintiffs allege that that PIIC improperly intervened in the underlying AFLDS leadership dispute, effectively picking a side—and supporting the wrong faction of directors—rather than complying with its obligations as an insurer. (*Id.*)

---

[1]PIIC contests both Gold's status and that "AFLDS" is a proper plaintiff in this action, given the foundational dispute as to the corporation's management. (ECF No. 8.)

1    Before the Court is PIIC's motion to dismiss the claims against it. (ECF No. 6

2 ("Motion").)[2] As further explained below, the Court grants the Motion in part and denies

3 it in part. The Court grants the Motion as to seven of Plaintiffs' claims, but denies the

4 Motion as to Plaintiffs' breach of contract and declaratory relief claims. The Court

5 dismisses with leave to amend Plaintiffs' claims for aiding and abetting a tort, violations

6 of NAC § 686A.665, contractual and tortious breach of the implied covenant of good

7 faith and fair dealing, and negligence/negligent supervision. The Court dismisses

8 without leave to amend the claims for breach of fiduciary duty and injunctive relief.

9  **II.    BACKGROUND[3]**

10    Plaintiff Simone Gold founded AFLDS in 2020 as a 501(c)(3) charitable

11 organization with a stated mission of "advancing medical freedom" and a focus on

12 opposing many COVID-19 pandemic control measures.[4] (ECF Nos. 1 at 2, 6.) Gold was

13 a member of the original AFLDS board of directors ("AFLDS Board" or "the Board") and

14 served as AFLDS's President and Executive Director during the first years after its

15 inception. (ECF No. 1.) Defendant PIIC, a Pennsylvania corporation, issued two

16 relevant directors' and officers' insurance policies to AFLDS (collectively, "Policy"),

17 covering the periods from January 3, 2022 to January 3, 2023 (policy number

18 PHSD1684378) and January 3, 2023, to January 3, 2024 (policy number

19 PHSD1759053. (*Id.* at 3.) The PIIC Policy was issued in Nevada, and PIIC stated in a

20 July 2023 letter that the Policy would be interpreted under Nevada law. (*Id.*)

21    In 2022, Gold was sentenced to a 60-day term in federal prison for unlawfully

22 entering and remaining in a restricted area of the United States Capitol on January 6.

23 (ECF Nos. 1, 6 at 2.) In the months surrounding her sentencing, in 2022 and early 2023,

24 the makeup of the AFLDS Board became the subject of significant conflict, with multiple

25

26    [2]Plaintiff filed a response (ECF No. 8) and Defendant filed a reply (ECF No. 10).

27    [3]The following facts are adapted from the Complaint unless otherwise noted.

28    [4]AFLDS was incorporated and is organized under the laws of the state of Arizona. (ECF No. 1 at 2.)

factions claiming to be the organization's "real" leadership and debating Gold's status. (ECF No. 1 at 4.) Gold maintains that she never resigned from the Board or otherwise lost her status as a director, despite her brief prison sentence.[5] (*Id.* at 6 n. 3.) But she alleges that in 2022, rogue members of the AFLDS Board began to take over the organization, ultimately empowering a "brand-new group of dupes and crooks" attempting to wrest power away from "the corporation's legal management that actually ran the company day-to-day." (*Id.* at 1.)

The rightful membership of the AFLDS Board—and the introduction of the alleged "dupes and crooks"—is at issue in an ongoing[6] action in Arizona state court (Maricopa County Case No. CV2022-015525 ("Arizona Action")). (*Id.* at 4.) Gold initiated the Arizona Action and brought claims against Directors Mack, Gilbert, and Matthesius (collectively, "Arizona defendants"), members of the Board who began to assert that they were AFLDS's proper leaders in 2022. (*Id.*)

As a defendant in the Arizona Action, Director Gilbert filed a claim for legal defense with PIIC under the AFLDS Policy, and PIIC hired the Metzger Law Firm to defend Mack, Gilbert, and Matthesius in the suit. (*Id.*) PIIC has continued to afford a defense to the Arizona defendants throughout litigation in the Arizona Action. (*Id.*) Plaintiffs allege that the attorneys PIIC selected to represent the Arizona defendants were never authorized by a legitimate AFLDS Board vote. (*Id.*) They further allege that neither PIIC nor the hired attorneys interviewed other existing members of the Board, any purported member of the AFLDS executive leadership team, or any other AFLDS employee before undertaking to provide support to the Arizona defendants. (*Id.*)

In early 2023, while participating in the Arizona Action's preliminary injunction hearing, one of the three Arizona defendants (Director Mack) reversed his position and

---

[5]Defendant disputes Gold's characterization that she never resigned and insists that she formally resigned from the Board in advance of her sentence. (ECF No. 6 at 2.)

[6]The Arizona litigation was ongoing as of the time this action was initiated and this Motion filed.

1  joined Plaintiff Gold, at which time he was dismissed from the Arizona Action. (*Id.*)
2  Plaintiffs allege that he changed sides in the dispute because he became aware of
3  financial malfeasance on the part of his former co-defendants. (*Id.*) In March 2023, the
4  remaining Arizona defendants' outside attorneys from multiple firms—except those from
5  the Metzger firm—ceased their representation. (*Id.* at 5.) And on March 31, Arizona
6  defendants Gilbert and Matthesius formally resigned as directors of AFLDS. (*Id.*)

7      Director Mack continued to sit on the Board after Gilbert and Matthesius's formal
8  resignations. (*Id.* at 6.) Following his former co-defendants' departures, Mack officially
9  re-appointed Gold to the AFLDS Board. (*Id.*).[7]

10     In the aftermath of Mack's dismissal from the Arizona Action and Gilbert and
11  Matthesius' resignations, Plaintiffs assert that "the case could have been dismissed at
12  this time but for [PIIC's] unaccountable continued interference." (*Id.* at 5.) Rather than
13  recognize the illegitimacy of the Arizona defendants' prior leadership claims, Plaintiffs
14  allege, PIIC increased its involvement in the litigation. (*Id.*) At this time the "real" AFLDS,
15  under Gold's renewed command, asked PIIC to cease and desist and sought to obtain
16  coverage for Gold and for the organization. (*Id.* at 5.) Upon demand, PIIC refused to
17  provide coverage for separate defense counsel to represent Gold and others claiming to
18  be AFLDS's proper managers, while it continued to provide coverage to the Arizona
19  defendants. (*Id.* at 8.)

20     In particular, on May 19, 2023, attorney Jose Jimenez sent an email to PIIC
21  representatives stating that he represented Gold—referred to as President and
22  Chairman of the Board—and that she was making a claim on an individual basis and on
23  behalf of AFLDS on the PIIC policy, "on all coverages and policies that apply to the
24  claims made against her and the claims she has made against others." (*Id.* at 6.) Gold
25  and AFLDS requested "an immediate investigation, defense, and indemnity on this
26  claim" and noted that "[t]ime is of the essence in this matter, especially given

27  _____

28      [7]Gold maintains that she has always been a member of the Board, but state that
   "in an abundance of caution," Director Mack formally re-appointed her. (*Id.* at 6 n. 3.)

Philadelphia Indemnity Insurance Company's improper assistance of others in a current dispute." (*Id.*) PIIC's agent, Patrick Farrell, acknowledged the email on May 24, 2023, and PIIC's claims department acknowledged the correspondence on June 5, 2023. (*Id.*)

Making matters more chaotic and raising the stakes of the Arizona Action, Plaintiffs allege that in the aftermath of Gilbert and Matthesius's resignations, another set of "dupes and crooks" took advantage of the organization's leadership dispute. (*Id.*) As a final act before their departure, Gilbert and Matthesius appointed three new directors, with no prior connection to AFLDS, to the Board. (*Id.*) For a brief period, these three directors operated separately from the Board led by Gold, holding meetings without the knowledge of Gold and the "real" AFLDS – which continued to function normally. (*Id.* at 6-7.) Plaintiffs refer to this faction, led by the three new individuals, as the "Fake Board." (*Id.*)

Plaintiffs allege that all three "Fake Board" members resigned within roughly six weeks of their appointment, at least two because they learned they were being used to "effectuate fraud by an intermeddler named Kevin Jenkins." (*Id.* at 7.) Plaintiffs further allege that Kevin Jenkins "conceived a scheme to loot millions from AFLDS's treasury." (*Id.* at 9.) After Gilbert and Matthesius resigned—and even after the "Fake Board" disintegrated—Jenkins named himself AFLDS's CEO, hired an attorney using stolen AFLDS money, and "undertook a cross-country crime spree" by visiting bank locations posing as AFLDS's CEO and attempting to empty the organization's accounts. (*Id.* at 9-10.) Jenkins stole $400,000 or more in AFLDS funds. (*Id.* at 10.) Jenkins has also publicly appeared in YouTube videos and other online platforms claiming to be AFLDS's "CEO in exile." (*Id.*) Jenkins and his lawyer have filed lawsuits against Gold that were dismissed for lack of standing or lack of authority. (*Id.*) Jenkins had and has no corporate indicia; he has never appeared on the AFLDS website, had a corporate email address, or appeared on any organizational social media. (*Id.*) Detailed articles were published about Jenkins' frauds contemporaneously with his alleged crime sprees. (*Id.*)

Plaintiffs allege that PIIC remained in close contact with Jenkins and his attorney as it continued to defend the Arizona Action, despite information suggesting that Jenkins was conducting fraud. (*Id.* at 11.) On June 21, 2023, Plaintiffs sent PIIC another letter demanding that PIIC provide coverage in the Arizona Action and again notifying PIIC of ongoing fraud. (*Id.*) PIIC responded only to refuse coverage and gave no response to the allegations of fraud. (*Id.*) In addition, two of the three members of the "Fake Board" made written declarations after their resignations, made available to PIIC, as to observing fraud on the part of Jenkins. (*Id.* at 7.) PIIC did not change course in response to these written declarations. (*Id.*)

Plaintiffs allege that after Gilbert and Matthesius resigned, and after the "Fake Board" disintegrated, PIIC continued to keep the Arizona Action live—without providing coverage to Gold and her allies under the Policy—to protect its own reputation. (*Id.* at 7-8.) PIIC's claims representatives gave direction directly to defense attorneys as to matters applicable to AFLDS. (*Id.* at 7.) And PIIC and the attorneys it selected continued to operate without consulting other ostensibly AFLDS-associated employees. (*Id.*)

In June 2023, PIIC filed an application to appoint a receiver for AFLDS in the Arizona Action, stating in the application that PIIC could not determine who was managing the corporation. (*Id.*) Plaintiffs allege that PIIC was aware, at this time, that Gold and the Board under her command were running the organization day-to-day and had been for the duration of the conflict. (*Id.* at 7.)

Plaintiffs bring nine claims against PIIC in the instant action, all stemming from the central allegation that PIIC improperly interfered in AFLDS's internal leadership dispute. (*Id.* at 12-19.) Plaintiffs assert claims for 1) aiding and abetting a tort; 2) violations of NAC §686A.665; 3) contractual breach of the implied covenant of good faith and fair dealing; 4) tortious breach of the implied covenant of good faith and fair dealing; 5) breach of fiduciary duty; 6) breach of contract; 7) negligence/negligent supervision; 8) temporary and permanent injunction; and 9) declaratory relief under 28 USC § 2201 and NRS § 30.030 *et seq.* (*Id.*) PIIC now moves to dismiss each of these

1   claims for insufficient pleading under Federal Rule of Civil Procedure 12(b)(6). (ECF No.
2   6.)

3   **III.   DISCUSSION**

4            PIIC moves to dismiss Plaintiffs' claims under Rule 12(b)(6) on numerous bases.
5   (*Id.*) First, across all causes of action, PIIC argues that any claims asserted on the
6   behalf of AFLDS in its organizational capacity should be dismissed because proper
7   control of the AFLDS Board has not yet been determined in the Arizona Action and thus
8   there is no standing. (*Id.* at 1.) Next, PIIC turns to Plaintiffs' individual claims and argues
9   that each fails. (*Id.* at 1-2.) *See* Fed. R. Civ. P. 12(b)(6) (providing that a court may
10  dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be
11  granted"); Fed. R. Civ. P. 8(a)(2). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
12  (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (emphasizing that
13  "[w]hile Rule 8 does not require detailed factual allegations, it demands more than
14  'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action'").

15           The Court first addresses the extrinsic documents attached to the Motion and
16  takes limited judicial notice of records from the Arizona Action. It then addresses
17  standing as to the claims brought on behalf of AFLDS. Finally, the Court addresses
18  whether Plaintiffs have stated a claim as to each individual cause of action.

19           **A.   Materials Judicially Noticed and Incorporated by Reference**

20           As a preliminary matter, the Court addresses the extraneous materials attached
21  to the Motion—and discussed extensively therein—to clarify the limitations in evidence it
22  may properly consider at the pleading stage. (ECF No. 6.) PIIC attaches numerous
23  documents to its Motion, arguing that the Court may take judicial notice of their contents
24  and/or that they are incorporated by reference into the Complaint. (ECF No. 6 at 2 n. 1.)
25  Most importantly, PIIC attaches large portions of the Arizona Action state court record
26  and asks the Court to take judicial notice of "orders previously entered by the Arizona
27  state court." (ECF No. 6 at 2 n. 1.) Plaintiffs argue that the Court may not consider the
28  exhibited documents—at least not to the extent that PIIC relies on them—without

1  converting the Motion into one of summary judgement. (ECF No. 8 at 7.) They further

2  argue that in effect, PIIC inappropriately "attempts to rely on the contents of the

3  [extraneous] documents to seek a factual determination and legal conclusions by this

4  Court", and that summary judgment consideration would be premature at this stage.

5  (*Id*.)

6     The Court generally may not consider material beyond the pleadings to evaluate

7  a complaint's legal sufficiency under Rule 12(b)(6). *See Knievel v. ESPN*, 393 F.3d

8  1068, 1072 (9th Cir. 2005) (emphasizing that when evaluating a motion under Rule

9  12(b)(6), courts generally "accept all factual allegations in the complaint as true and

10 construe the pleadings in the light most favorable to the nonmoving party"); Fed. R. Civ.

11 P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are

12 presented to and not excluded by the court, the motion must be treated as one for

13 summary judgment under Rule 56."). The Court may, however, consider exhibits

14 attached to a complaint or matters subject to judicial notice under Federal Rule of

15 Evidence 201 without converting the motion into one for summary judgment. *See Khoja*

16 *v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). While a federal court

17 may properly take judicial notice of court filings and other matters of public record, *see*

18 *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006), "a

19 court cannot take judicial notice of disputed facts contained in such public records,"

20 *Khoja*, 899 F.3d at 999. *See also Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003)

21 ("Taking judicial notice of findings of fact from another case exceeds the limits of Rule

22 201."). "[T]he unscrupulous use of extrinsic documents to resolve competing theories

23 against the complaint risks premature dismissals of plausible claims that may turn out to

24 be valid after discovery." *Khoja*, 899 F.3d at 998.

25     Relatedly, under the incorporation by reference doctrine, the Court may consider

26 "documents 'whose contents are alleged in a complaint and whose authenticity no party

27 questions, but which are not physically attached to the [plaintiff's] pleading.'" *Knievel*,

28 393 F.3d at 1076 (quoting *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th

Cir.1999)). Unlike when materials are judicially noticed, a court may assume that the contents of a document incorporated by reference are true for the purposes of a motion to dismiss under Rule 12(b)(6). *See Khoja*, 899 F.3d at 1003. But the "doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id.*

With regard to state court records in the Arizona Action—including the minute orders (ECF Nos. 6-1, 6-2, 6-3, 6-4) and the other court filings (ECF Nos. 6-5, 6-6, 6-7) attached to PIIC's Motion—the Court takes limited judicial notice of the *existence* of the Arizona Action and the attached orders as matters of public record, but declines to notice the factual contents of the record. *See Sabatini v. Nevada State Bd. of Nursing*, No. 2:22-CV-00219-GMN-VCF, 2023 WL 4963770, at *4 (D. Nev. Aug. 2, 2023) ("Judicial notice is properly taken of orders and decisions made by other courts and administrative agencies."). *See also Khoja*, 899 F.3d at 1003. To the extent that PIIC attempts to cite to *facts* in the state court record or to that court's preliminary findings, the Court agrees with Plaintiffs that this amounts to a premature bid for summary judgment based on a res judicata argument. (ECF No. 8 at 6.) *See Khoja*, 899 F.3d at 1003. Although the Court emphasizes the limits of its judicial notice of the Arizona Action materials, however, PIIC may properly cite to the noticed materials to support its general assertion that the issue of control of the corporation is the subject of the Arizona Action and remains unresolved in that litigation. (ECF No. 10 at 2.)  Indeed, PIIC insists in its reply that this is all it intends to do: it states that it is "not asking the Court to expressly adopt preliminary factual determinations made by the Arizona court." (*Id*.) The Court also acknowledges, as relevant throughout this order, that the Arizona Action was stayed at the time the Motion now before the Court was filed, and that there have been or may be requests for a receiver charged with protecting AFLDS's assets.

With regard to the other documents PIIC attaches as exhibits to its Motion, the Court considers the contents of the PIIC Policy (ECF Nos. 6-8, 6-10), as the Policy is incorporated by reference into the Complaint and Plaintiffs do not contest the propriety

1   of considering the substance of the Policy . (ECF Nos. 1, 8.) Plaintiffs in fact rely on the

2   Policy to support their own position. (ECF No. 8 at 15-16.)[8]

3        **B.      Standing to Sue on Behalf of AFLDS**

4        PIIC argues that all claims ostensibly brought by AFLDS, in its organizational

5   capacity, should be dismissed because control of the AFLDS Board remains

6   unresolved. (ECF No. 6 at 7-8.) PIIC also argues that Plaintiff Gold lacks standing, in

7   her individual capacity, to assert that PIIC breached its contract with AFLDS, because

8   Gold brought direct claims against AFLDS in the Arizona Action. (*Id.*) Plaintiffs argue, in

9   response, that PIIC's standing arguments are inappropriate at the pleading stage, as

10  well as "circular and nonsensical": there has been no judicial determination in the

11  Arizona Action, and PIIC improperly implies that "unless and until the Arizona Action

12  reaches a full and final adjudication of the disputes raised therein, AFLDS can't conduct

13  [any normal] business." (ECF No. 8 at 8.) The Court acknowledges that claims brought

14  on behalf of AFLDS—when the foundational conflict underlying those claims is a dispute

15  over who is entitled to make the organization's decisions—must be considered with

16  particular caution. However, because Plaintiffs have provided facts supporting Gold's

17  capacity to sue on behalf of herself and on behalf of AFLDS, the Court finds that the

18  Complaint sufficiently alleges that AFLDS has standing and treats AFLDS as a proper

19  plaintiff at this stage.

20       The Complaint states that Gold founded AFLDS and was and is a member of the

21  AFLDS Board with standing to sue. (ECF No. 1 at 1-5.) *See* ARS § 10-3631 (describing

22  individuals, such as members and directors, who have standing to sue on behalf of a

23  nonprofit corporation under Arizona law). PIIC asserts that claims brought by AFLDS

24  should be dismissed because, "since the issue of control has not yet been resolved and

25  a receiver has not yet been appointed [in the Arizona Action], it is unclear under whose

---

27  [8]PIIC also exhibited a May 19, 2023 tender letter from counsel (ECF No. 6-9).
28  The Court finds that it need only rely on the associated tender email (ECF No. 1 at 6)
    included in the Complaint to resolve this Motion. As a result, it does not address
    whether the exhibited letter (ECF No. 6-9) is independently incorporated by reference.

1   direction or authority the instant litigation was filed on behalf of AFLDS." (ECF No. 6 at

2   7.) But at best, PIIC's arguments suggest that factual questions as to AFLDS's

3   leadership and Gold's role—the same questions which implicate PIIC's performance

4   under the Policy and the merits of this action—also implicate her standing to sue on

5   behalf of AFLDS itself. When factual issues overlap with jurisdictional issues, federal

6   courts commonly defer resolution on jurisdictional issues until the factual record is

7   further developed. *See* 13B Charles Alan Wright *et al.* Federal Practice and Procedure

8   § 3531.15, at n.34 (3d ed. 2004) (collecting cases). *See also Alliance For Environmental*

9   *Renewal, Inc. v. Pyramid Crossgates Co*., 436 F.3d 82 (2d Cir. 2006).

10          Moreover, PIIC's citations to the Arizona Action record exceed the scope of

11   12(b)(6) consideration and misrepresent the implications of the state action. PIIC cites

12   to numerous state court minute orders, including a minute order stating the Arizona

13   court's finding that Gold resigned in February 2022, to argue that she *currently* lacks

14   standing. (ECF Nos. 6 at 7 n. 2, 6-1.) PIIC also argues that Gold brought direct claims

15   against AFLDS in the Arizona Action, and thus that she cannot sue on behalf of AFLDS

16   now. (ECF No. 6 at 5.) These arguments again go to the merits of the dispute and ask

17   the Court to interpret the factual history. As the Court has already emphasized, its

18   consideration of the Arizona Record at this stage is limited. The Court does not take for

19   its truth, for example, the Arizona court's preliminary discussion of Gold's membership

20   on the board in 2022. In addition, the January 27, 2023, court minutes upon which PIIC

21   significantly relies are from a preliminary injunction hearing, are not a final order with

22   preclusive effect, and cannot be accurately interpreted without the context of the full

23   Arizona record. (ECF No. 8 at 6.) And PIIC does not address how Gold's status on the

24   AFLDS Board several years ago necessarily implies that she lacks standing to sue at

25   later times. To the extent that the Court considers that the issue of control of AFLDS is

26   pending resolution in the Arizona Action, and that there are requests for a receiver

27   charged with protecting AFLDS's assets, these circumstances only further suggest that

28

1   making a determination that Gold and AFLDS lack standing now, prior to discovery,

2   would be premature.

3        In sum, the Arizona Action record, as judicially noticed, does not contradict

4   Plaintiffs Gold and AFLDS's standing at this stage as supported in the Complaint,

5   especially given that the instant Motion is not a motion to dismiss for lack of subject

6   matter jurisdiction under Rule 12(b)(1). And PIIC has not presented caselaw to support

7   its position that AFLDS may not bring claims on its own behalf unless and until the

8   Arizona Action is resolved. Thus, the Court does not dismiss any of Plaintiffs' claims on

9   the basis of lack of standing—although it does not foreclose the possibility that some of

10  PIIC's arguments here may be appropriately raised on summary judgment.

11       **C.    Claim One—Aiding and Abetting a Tort**

12       Defendant moves to dismiss Plaintiffs' first claim for aiding and abetting a tort,

13  arguing first that Plaintiffs have not pled facts to support that an underlying tort occurred

14  and second that the facts related to Kevin' Jenkins' alleged fraudulent scheme do not

15  support an aiding and abetting claim because Jenkins is not a named defendant in this

16  action. (ECF No. 6 at 8.) Plaintiffs respond that PIIC erroneously assumes that an

17  underlying tortfeasor must be a party in an action for named parties to face aiding and

18  abetting liability related to the tortfeasor's conduct. (ECF No. 8 at 10-11.) They further

19  insist that the Complaint contains ample facts to support that Jenkins' conduct was

20  tortious, and that his torts include conversion, fraud, civil conspiracy, misappropriation,

21  and negligence. (*Id.*)

22       Under Nevada law, liability attaches for a derivative civil aiding and abetting if an

23  individual "substantially assists or encourages another's conduct in breaching a duty to

24  a third person." *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998), abrogated

25  on other grounds by *GES, Inc. v. Corbitt*, 21 P.3d 11 (Nev. 2001). "Aiding-and-abetting

26  liability depends on the existence of an underlying tort." *In re Mortgage Elec.*

27  *Registration Sys., Inc.*, 754 F.3d 772, 786 (9th Cir. 2014). To support a claim for aiding

28  and abetting a tort, a plaintiff must generally prove 1) that a third party committed a tort

that injured the plaintiff; 2) that the defendant was aware of their role in promoting the tort at the time they provided assistance; and 3) that the defendant knowingly and substantially assisted the third party's conduct. *See Dow Chem.*, 970 P.2d at 112; *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 460 F. Supp. 2d 1246, 1261 (D. Nev. 2006). In addition, to support a claim for aiding and abetting fraud, a plaintiff must plead the misrepresentation or omission with *particularity*. Rule 9(b)'s heightened pleading standard also applies to civil aiding and abetting claims when they sound in fraud and "are 'based in a unified course of fraudulent conduct.'" *See Urban Outfitters, Inc. v. Dermody Operating Co., LLC*, Case No. 3:21-CV-00109-MMD-CLB, 2022 WL 4134127, at *5-6 (D. Nev. Sept. 12, 2022) (quoting *Motogolf.com, LLC v, Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168, 1174 & n.3. (D. Nev. March. 25, 2021). *See also Allstate Life Ins. Co. v. Robert W. Baird & Co., Inc.*, 756 F. Supp. 2d 1113, 1165 (D. Ariz. 2010); Ariz. R. Civ. P. 9(b); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Here, the Court agrees with Plaintiffs that Jenkins need not be a named defendant in this action in order for his allegedly tortious conduct to serve as the basis for aiding and abetting liability. PIIC's position that Jenkins must be a named defendant is inconsistent with general principles of joint and several liability, under which aider and abettor liability attaches only when there has been an *independent breach* beyond the misconduct of the primary tortfeasor in supporting the underlying tort. *See, e.g.*, Restatement (2d) of Torts § 876; Restatement (3d) of Torts, Liability for Economic Harm, § 28 (supporting that in general, when two or more parties are jointly and severally liable for a tortious act, each is independently liable for the full extent of the injuries, and that a person can be liable for a tort committed by another when they substantially assist the other and when their own conduct constitutes a separate breach). *See also* RAJI (Civil) 4th Intentional Tort 23, Aiding and Abetting Tortious

Conduct Use Note ("The individual who was the primary tortfeasor may or may not be an additional named defendant."). PIIC has not cited any contrary caselaw.

However, while PIIC may be liable for Jenkins' conduct even though he is not a named defendant, Plaintiffs fail to adequately allege facts to support each *underlying tort* that ostensibly occurred. *See In re Mortgage Elec. Registration Sys., Inc.*, 754 F.3d at 786. As pled in the Complaint, Plaintiffs' first claim rests on a general assertion that PIIC aided and abetted a set of undefined torts—they suggest that these underlying torts include, but are not limited to, "conversion, fraud, civil conspiracy, misappropriation, and negligence." (ECF No. 1 at 12.) This is not sufficient to state a claim, especially because some of these torts sound in fraud and others—such as civil conspiracy—are generally brought as separate claims. *See Dow Chem.*, 970 P.2d at 112 ("Concert of action resembles the tort of civil conspiracy . . . Civil conspiracy in Nevada differs from concert of action as defined in Section 876 in that civil conspiracy requires that the defendants have an intent to accomplish an unlawful objective for the purpose of harming another, while concert of action merely requires that the defendants commit a tort while acting in concert. Both causes of action require an agreement.").

With further elaboration, Plaintiffs' allegations regarding Jenkins, among other allegations, could possibly go towards supporting several torts. Jenkins' conduct, ostensibly, includes looting the AFLDS treasury and claiming to be the organization's leader to access corporate assets. (ECF No. 1 at 9-12.) Particularly to the extent that PIIC knew about Jenkins' misrepresentations and chose to act in a manner in the Arizona Action that allowed him to continue with his schemes, Plaintiffs could arguably state an appropriate aiding and abetting claim. However, because Plaintiffs have not distinguished between possible underlying torts or made clear which facts in the rest of the Complaint they use to support the elements of those torts—and because the Court would be forced to make extensive inferences from the facts currently alleged in the Complaint in order to parse through these vaguely referenced possible torts—the Court finds that Plaintiffs fail to state a claim. *See Iqbal*, 556 U.S. at 678.

Accordingly, the Court dismisses Plaintiffs' aiding and abetting claim with leave to amend, finding that justice so requires and amendment would not be futile. *See* Fed. R. Civ. P. 15(a)(2) (providing that the Court may freely give leave to amend when "justice so requires"). If Plaintiffs choose to file an amended complaint, they must plead facts to support the aiding and abetting elements of each underlying tort independently and must be clear about which factual allegations support each aiding and abetting claim, rather than merely providing an open-ended list. To the extent that an amended aiding and abetting claim rests on underlying torts which "sound in fraud," Plaintiffs are also cautioned that they must plead with particularity, conforming with the requirements of Rule 9. And finally, Plaintiffs are cautioned to comply with limitations in Nevada law as to where and how aiding and abetting liability may attach. *See, e.g.*, *Dow Chem.*, 970 P.2d at 112; *In re J&J Inv. Litig.,* No. 2:22-CV-00529-GMN-NJK, 2023 WL 2572300, at *6 (D. Nev. Mar. 18, 2023).

### D.   Claim Two—Violations of NAC § 686A.665

PIIC moves to dismiss Plaintiffs' second cause of action, brought for violations of NAC § 686A.665, on the basis that the Nevada Division of Insurance has exclusive original jurisdiction when a party seeks to ensure compliance with the Nevada Administrative Code. (ECF No. 6 at 8.) *See Fernandez v. State Farm Mut. Aut. Ins. Co.*, 338 F.Supp.3d 1193, 1201-02 (D. Nev. 2018). Plaintiffs concede that this cause of action was improperly pleaded and that there is no private right of action under this portion of the Nevada Administrative Code, but ask for leave to amend to reference the appropriate statute—NRS § 686A.310—instead. (ECF No. 8 at 12.) The Court dismisses this claim and grants leave to amend to state a claim under NRS § 686A.310.

NRS § 686A.310, the statute to which Plaintiffs intend to refer, addresses unfair practices in settling claims and liability of insurers for damages. Many of the facts in Plaintiffs improperly pled NAC claim—including allegations as to unreasonably delayed response times (ECF No. 1 at 13)—may also apply to a proper claim under NRS § 686.310. *See* NRS § 686A.31(1)(b) (providing that unfair practices may include "[f]ailing

to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies"). Other allegations in the Complaint also support a claim under NRS § 686.310. The Court dismisses this claim with leave to amend *only* to state a claim under NRS § 686A.310.[9] *See* Fed. R. Civ. P. 15.

E.   **Claim Three—Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing**

Plaintiffs bring claims for contractual and tortious breach of the implied covenant of good faith and fair dealing under a combined heading, with combined factual allegations. (ECF No. 1 at 13-14.) PIIC's Motion and Plaintiffs' response address contractual and tortious breach independently, and the Court also does so here.

PIIC argues that dismissal of Plaintiffs' contractual breach of the implied covenant of good faith and fair dealing claim is warranted as a matter of law, because the same allegations are used for both the implied contractual breach claim and the express breach of contract claim. (ECF No. 6 at 9.) Plaintiffs respond that they are entitled to plead in the alternative, and that numerous facts alleged in the Complaint are consistent with an implied breach of contract claim—rather than an express breach claim. (ECF No. 8 at 13-18.) Because it finds that Plaintiff has not adequately pled separate facts to support their express and implied breach of contact claims, the Court dismisses Plaintiffs' implied contractual breach claim with leave to amend to clarify the facts on which it bases each contractual claim.[10]

A contractual breach of the implied covenant of good faith and fair dealing occurs "[w]here the terms of a contract are literally complied with but one party to the contract

---

[9]PIIC opposes amendment and argues that Plaintiffs should have complied with LR 15-1(a) and LR IC 2-2(b). (ECF No. 10.) However, the Local Rules afford the Court discretion in line with Rule 15's liberal amendment standard. *See* LR 15-1(a); LR IC 2-2(b). The Court uses its discretion here.

[10]As further explained below in the discussion of claim four (tortious breach of the implied covenant of good faith and fair dealing), the Court also grants Plaintiffs leave to amend its implied contractual and tortious breach claim to the extent necessary to clarify between the elements of these two claims.

16

deliberately countervenes the intention and spirit of the contract." *See Stebbins v. Geico Ins. Agency*, Case No. 2:18-CV-00590-APG-GWF, 2019 WL 281281, at *2-3 (D. Nev. Jan. 22, 2019) (quoting *Hilton Hotels Corp. v. Butch Lewis Prod., Inc.*, 808 P.2d 919, 922-23 (Nev. 1991)). *See also Armina Wagner Enterprises, Inc. v. Ohio Sec. Ins. Co.*, Case No. 2:21-CV-897-JCM-DJA, 2023 WL 2072499, at *5 (D. Nev. Feb. 17, 2023). Unlike a breach of contract claim, a contractual breach of the implied covenant of good faith and fair dealing requires *literal* compliance with the word of the contract. *See Stebbins*, 2019 WL 281281, at *2-3. Parties to a contract may have an implied contractual duty to refrain from manipulating or unfairly promoting some interests over others for their own benefit. *See Hilton*, 808 P.2d at 922-23 (finding that promoters had a contractual duty to "promote . . . events in a fair manner and not to manipulate who would be or who would not be the [event] champion and so advance their own interests in a manner that would compromise [the plaintiff's] benefits under the contract" in order to benefit themselves).

Plaintiffs may plead in the alternative. *See* Fed. R. Civ. P. 8(d). But "It is well established that a claim alleging breach of the implied covenants of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim." *Stebbins*, 2019 WL 281281, at *2-3 (quoting *A.C. Shaw Constr. v. Washoe Cty.*, 784 P.2d 9, 9 (Nev. 1989)). Thus, while "plaintiffs may plead both breach of contract and breach of the implied covenants as alternative theories of liability, all elements of each cause of action must be properly pleaded." *Stebbins*, 2019 WL 281281, at *3.

Here, the Court agrees with Plaintiffs that they may properly plead, as a matter of law, an express breach of contract and an implied breach of contract claim in the alternative as long as independent facts support the elements of each claim. *See* Fed. R. Civ. P. 8(d). The Court also finds that as it stands, the Complaint already contains numerous factual allegations consistent with an implied contractual breach claim— rather than an express breach claim—to the extent these facts suggest that PIIC may

17

have *literally* complied with the terms of the Policy while violating its spirit. (ECF No. 8 at 13.) *See Stebbins*, 2019 WL 281281, at *2-3. Plaintiffs allege that PIIC "performed under the Policy in such a manner that it was unfaithful to the purposes of the agreement, including, but not limited to, not providing a defense to Plaintiffs, not investigating the factual issues surrounding the Arizona Litigation, pursuing its own agenda in the Arizona Litigation, among other improper conduct." (ECF No. 1 at 14.) However, the factual allegations which may support each separate claim are scattered throughout the Complaint and hard to distinguish. In their response to the Motion, for example, Plaintiffs point to allegations including that 1) "For reasons known only to it, before providing defense coverage, [PIIC] did not perform a reasonable investigation but merely 'picked' a side in an internal corporate dispute"; 2) "[PIIC] failed to respond to Dr. Gold's request for a defense"; 3)  "[PIIC] failed to facilitate resolution, when that was in the interest of its insured"; and 4) "[PIIC] acted as an unauthorized proxy" in its interactions with AFLDS's defense counsel. (ECF No. 1 at 5-12.) Plaintiffs also ask the Court to recast the allegations made under its breach of fiduciary duty claim (claim five) as part of its implied contractual breach claim. (ECF No. 8 at 13-14.)

Because the distinctions between the factual allegations used to support Plaintiffs' express and implied breach of contract claims are intertwined and muddled, and because—as explained below—the Court will permit Plaintiffs to proceed with their express breach claim, the Court dismisses Plaintiffs' implied contractual breach claim with leave to amend. In an amended complaint, Plaintiffs may elaborate on which distinct facts support that PIIC breached of the *spirit* of the Policy, and may further distinguish this claim from the proceeding express breach of contract claim. In addition, Plaintiffs may also amend to incorporate facts originally included in their breach of fiduciary duty claim (claim five) which the Court dismisses with prejudice as unopposed,

while they are cautioned to keep in mind that some of those allegations may be appropriate to an implied tortious breach claim.[11]

### F.    Claim Four—Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing

PIIC argues for dismissal of Plaintiffs' claim for tortious breach of the implied covenant of good faith and fair dealing on the basis that Plaintiffs cannot support that PIIC acted in bad faith by not providing a defense in the Arizona Action or otherwise allowing Plaintiffs to participate in such a defense. (ECF No. 6 at 10-11.) Plaintiffs respond that PIIC erroneously suggests that failure to compensate an insured for a covered loss is the only type of bad faith for which an insurer may be liable, and that the factual allegations in the Complaint provide numerous factual foundations for tortious breach. (ECF No. 8 at 14). In addition, Defendant also argues that dismissal is warranted because Plaintiffs' claims for contractual breach (claim three) and tortious breach (claim four) are "identical and duplicative." (ECF No. 6 at 9.) The Court finds the majority of PIIC's arguments unpersuasive at the motion to dismiss stage, but dismisses Plaintiffs' implied tortious breach claim with leave to amend to distinguish between and properly state its implied breach claims in relation to its express breach claim.

The Nevada Supreme Court has noted "the difference between a tort action and contract action in good faith covenant cases, pointing out that the tort action requires a special element of reliance or fiduciary duty . . . ." *See Hilton*, 808 P.2d at 922-23. *See also A.C. Shaw Construction*, 784 P.2d at 10. Tort liability for breach of the implied covenant is rare*, K Mart Corp. v. Ponsock*, 732 P.2d 1364, 1370 (Nev. 1987), and is **"**appropriate where 'the party in the superior or entrusted position' has engaged in

---

[11]Relevant factual allegations pled as part of the fiduciary duty claim include 1) After Gilbert and Matthesius resigned, PIIC began to act as a proxy director, instructing the Metzger law firm, and 2) by undertaking to direct AFLDS's attorneys, PIIC assumed a special fiduciary duty, which it then breached. (ECF No. 1 at 14-15.) While Plaintiffs argue that these factual allegations should be incorporated into their claim for implied contractual breach, some appear to be equally or more appropriate for a tortious breach claim.

'grievous and perfidious misconduct.'" *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 263 (Nev. 1997). The necessary reliance to support tortious breach claims arises in various relationships, "including those formed by employment, bailment, insurance, partnership, and franchise agreements." *Id. See also Stebbins*, 2019 WL 281281, at *2-3. For example,  an insurer may "breach[] the duty of good faith when it refuses without proper cause to compensate its insured for a loss covered by the policy. *Id.* In this circumstance, "[t]o constitute a denial without proper cause, an insurer must have actual or implied awareness of the absence of a reasonable basis for denying benefits of the policy." I*d.*

To start, the insurance relationship between PIIC and AFLDS is clearly a "special" one of trust which may support tort liability. *See id.* The Court also agrees with Plaintiffs that PIIC's argument for dismissal focuses to narrowly on the issue of its denial of coverage in the Arizona Action, while missing the broader set of ways in which an insurer may act in bad faith. *See, e.g.*, *Great Am. Ins. Co.*, 934 P.2d at 263. Indeed, the Complaint contains allegations related to bad faith that stretch beyond mere denial of a defense to Gold. For example, Plaintiffs allege that Plaintiff did not *investigate* the factual issues surrounding the Arizona Action in order to pursue its own agenda. (ECF No. 1 at 4.) Put simply, the heart of this suit is Plaintiffs' view that PIIC in fact went "rogue" and acted, laterally to the contract, to muddy the waters as to the leadership of the organization. *See Great Am. Ins. Co.*, 934 P.2d at 263 (noting that tortious breach claims succeed primarily where a plaintiff demonstrates egregious conduct).

Moreover, the Court finds that even in focusing narrowly on the issue of denial of defense coverage to Gold and her allies—and whether or not there was a rational basis to do so—PIIC's arguments generally fall short or are properly raised only at the summary judgment stage. The crux of PIIC's argument on this point is that it *has*, in fact, been providing "AFLDS" a defense in the Arizona Action—contrary to Gold's assertions—because "Plaintiff Gold in her individual capacity is pursuing *direct claims* against Plaintiff AFLDS" in that action. ((ECF No. 6 at 10) (emphasis added).) PIIC

implies here that because Gold brought direct claims against AFLDS in the Arizona Action, and because a receiver has not yet been appointed, it cannot have engaged in bad faith by refusing to withdraw its defense. (*Id.*) PIIC surmises, citing to insurer case law, that "[b]ecause PIIC is acting reasonably by providing a defense for AFLDS and has a good faith basis to refuse to withdraw that defense given the issue of control has not yet been determined, this Court should dismiss as a matter of law any tortious bad faith claim purportedly relating to the defense of AFLDS." (*Id.*) In addition, PIIC goes on to argue that the terms of the relevant Policy from 2022-2023 and from 2023-2024 themselves demonstrate that PIIC has not engaged in bad faith, because—in short— Gold failed to make or give notice of claims within the Policy periods or made claims during short gaps in Policy coverage. (*Id.*) In effect, PIIC argues that Gold missed the boat.

But there are several problems with PIIC's position here. First, PIIC again seems to ask the Court to consider factual findings from the records in the Arizona Action which are beyond the purview of this Court's analysis, and the Court cannot fully consider the nature of the direct claims ostensibly brought by Gold against "AFLDS" without looking more deeply into those state court's findings. Second, and more importantly, PIIC's arguments require factual analysis and determinations, beyond merely a simple interpretation of the language of the Policy as incorporated into the Complaint. For example, there are numerous factual questions which relate to if, when, and how PIIC received notice of Plaintiffs' counterclaims. (*Id.*) PIIC seems to ask the Court to gloss over these factual questions as they interact with contract language (which itself contains ambiguities as it requires that the "insured" —defined elsewhere in the Policy as both "individual insured" and/or the "organization" —give written notice of claims). (ECF No. 8 at 3.) For example, as Plaintiffs emphasize in their response to the Motion, PIIC has not provided support for its position that the date of filing of a counterclaim is a trigger, as opposed to date of receipt. (*Id.* at 17.) Given that Gold was chair of the AFLDS Board, and that litigation was raging in Arizona court with former

directors as both plaintiffs and defendants, it would be inappropriate for the Court to give premature weight to PIIC's technical argument that it had an undeniably reasonable basis to deny coverage to Gold, due to loopholes in an insurance contract which may or may not apply. *See also Farmers Ins. Grp. v. Stonik*, 867 P.2d 389, 391 (Nev. 1994) ("An insurance policy is a contract of adhesion and should be interpreted broadly, affording the greatest possible coverage to the insured" such that "[a]ny ambiguity…must be interpreted against the drafting party.").

While the Court finds that dismissal of the tortious breach claim *as a matter of law* would be premature given the unresolved factual questions as to the reasonableness of PIIC's actions, it nevertheless dismisses the tortious breach claim with leave to amend because it finds again that the Complaint muddies the distinctions between implied tortious breach, implied contractual breach, and express contractual breach claims and fails to make clear the facts upon which it relies to support the elements of each claim. *See Twombly*, 550 U.S. at 562 (*quoting Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989) (emphasis in original)) (noting that a complaint must contain either direct or inferential allegations concerning "all the material elements necessary to sustain recovery under *some* viable legal theory"). *See also* Fed. R. Civ. P. 15. Because Plaintiffs' contractual and tortious breach claims are pled under the same heading—even though a tortious breach claim contains additional elements and is generally applicable in only extraordinary cases—and because the Court has already dismissed the implied *contractual* breach claim as insufficiently distinguished from the express breach claim—the Court also dismisses the tortious breach claim with leave to amend in the interests of justice. Plaintiffs may amend to correct deficits and to avoid confusion as to the Court's inferences across all three claims. *See* Fed. R. Civ. P. 15.

If Plaintiffs choose to file an amended complaint, they must 1) clearly plead facts to support their implied contractual breach claim distinct from their express contractual breach claim, and 2) support the additional elements necessary to establish an implied

tortious breach claim. As also discussed above, they may also amend to incorporate factual allegations included in their breach of fiduciary duty claim (claim five), which the Court dismisses with prejudice, into their implied breach claims.

### G.    Claim Five—Breach of Fiduciary Duty

Plaintiffs concede in their opposition to the Motion that Nevada does not recognize an independent breach of fiduciary duty claim against an insurer, *see, e.g., Walker v. State Farm Mut. Auto. Ins. Co.*, 259 F.Supp.3d 1139, 1150 (D. Nev. 2017), aff'd, 758 F. App'x 599 (9th Cir. 2019), and that for the purposes of an insurer-insured relationship, this claim "fall[s] under the breach of the covenant of good faith claims," (ECF No. 8 at 18). Accordingly, Plaintiffs' fifth cause of action fails as a matter of law and is dismissed with prejudice.[12]

### H.    Claim Six—Breach of Contract

PIIC argues that the Court should dismiss Plaintiffs' breach of contract claim because "[i]t has not yet been determined who actually controls the board and the Arizona state court has not yet appointed a receiver." (ECF No. 6 at 12.) Here, Defendant again emphasizes that the Arizona state court has determined that Gold was asserting direct claims against AFLDS, and that PIIC refused to withdraw its defense at Gold's request given these direct claims. (ECF No. 6 at 12.) Plaintiffs respond that PIIC sets forth an inaccurately narrow interpretation of the alleged breach when it describes that breach as merely PIIC's "fail[ure] to stop defending AFLD against the Arizona litigation," ignoring many other allegations in the Complaint which are incorporated into this claim. (ECF No. 8 at 18.) The Court agrees with Plaintiffs that "[t]he crux of the allegation . . . is not that [PIIC]'s attorneys should have withdrawn from the case and left AFLDS pro se, it's that [PIIC] was obligated to listen to representatives of AFLDS, instead of solely in its own interest, when making decisions as to whether to take certain

---

[12]The Court finds that in the interests of justice, Plaintiffs may amend their good faith and fair dealing claims to include the factual allegations originally pled as part of their fiduciary duty claim (claim five).

actions in the case, including whether to settle, whether to seek appointment of a receiver, as well as myriad other decisions." (ECF No. 8 at 18.) The Court thus denies PIIC's Motion and will allow Plaintiffs' express breach of contract claim to proceed.

Plaintiffs allege that the Policy requires that PIIC will provide a defense "for AFLDS," and that "when notified of AFLDS's express wishes to stop defending the organization, because its selected insurance defense lawyers were causing more harm than good, [PIIC] willfully and intentionally refused to honor its obligations under the contract." (ECF No. 1 at 15.) Plaintiffs further allege that AFLDS had the right to provide direction to the attorneys appointed to defend it and to have separate counsel in the event of a conflict of interest. (ECF No. 1 at 15.) The Court finds that these claims are supported by factual allegations and by the language of the Policy.

Centrally, Plaintiffs adequately allege that PIIC's failure to provide a defense to Gold constituted a breach of the Policy both to AFLDS and to Gold individually. PIIC seems to suggest that because conflicts of interest existed between Gold and others associated with AFLDS as to the leadership of the organization—exemplified in Gold's direct claims in the Arizona Action—PIIC was justified in providing coverage to the Arizona defendants and remaining aggressively committed to their defense over Gold and her allies' objections. (ECF No. 6.) But even taking at face value that leadership of AFLDS remains undetermined awaiting the appointment of a receiver and resolution of the Arizona Action, PIIC misses the point. Allegations as to the unavoidable conflicts of interest between Gold and the other Defendants in fact go to *support* Plaintiffs' position that PIIC breached its contractual obligations. "When a conflict of interest exists between an insurer and its insured, Nevada law requires the insurer to satisfy its contractual duty to provide representation by permitting the insured to select independent counsel and by paying the reasonable costs of such counsel." *State Farm Mut. Auto. Ins. Co. v. Hansen*, 357 P.3d 338, 341-42 (Nev. 2015). Plaintiffs specifically refer to this requirement under Nevada law in the Complaint. (ECF No. 1 at 3.) Even more importantly, PIIC does not address the fact that the Policy itself provides coverage

24

to both current and former directors, as well as to the organization—making its focus in the Motion on the timing of Gold's ostensible resignation from the board largely irrelevant.[13]

Centrally, PIIC's insistence that it was required to defend "AFLDS" in the Arizona Action and to ignore Gold's requests, such that the Court should dismiss this claim at the pleading stage, is undercut by numerous factual allegations in the Complaint. Allegations which plausibly support that PIIC's obligation to provide coverage to Gold was triggered include 1) Directors Gilbert and Matthesius—original members of the other "faction" of purported AFLDS leaders—resigned from the Board, and Director Mack joined sides with Gold; 2) the Arizona defendant's other attorneys, except those supported by PIIC, resigned; 3) Plaintiffs informed PIIC on numerous occasions, through various modes of communication, about Jenkins fraudulent activities and about his relationship to the Arizona defendants; 4) Members of the "Fake Board" resigned and wrote declarations as to Jenkins' fraud; and 5) PIIC took an active role in seeking appointment of a receiver in the action without engaging with Gold and her allies' complaints. (ECF No. 1 at 3-12.)[14]

In this context, the Court also finds it particularly pertinent to note that Gold was never merely a minor player in AFLDS—she was the founder of the organization and was the chair of the Board. (ECF No. 1 at 1-2.) She has been the face of the corporation for most of the years since its founding in 2020. And at least since Matthesius and Gilbert's resignations and the disintegration of the Fake Board, Plaintiffs assert that Gold has actively managed the organization. (ECF Nos. 1, 8.) PIIC's argument that it

[13]The Policy defines "Individual Insured" as "Any individual who has been, now is or shall become a director, officer, governor, trustee, equivalent executive, employee (whether salaried or not), volunteer, leased or temporary employee, or committee member of the organization." (ECF No. 6-8 at 39.) The Policy further defines "Insured" as "the Organization and Individual Insured." (*Id.*)

[14]The Court notes that some central factual allegations may support implied contractual breach and implied tortious breach claims, rather than the express breach claim. If Plaintiffs file an amended complaint, they should ensure that these distinctions are clear.

determined that it was in compliance with the Policy because of Gold's direct claims, therefore, rings particularly hollow. PIIC could plausibly have breached the Policy *regardless* of the outcome of the Arizona Action. As Plaintiffs highlight, PIIC maintains a paradoxical position: It argues simultaneously that it remains unknown who leads AFLDS—and thus who AFLDS "is" —pending the results of the Arizona Action, and that it did not breach its obligations under the Policy because it was merely defending AFLDS. (ECF No. 8 at 5.)

In sum, Plaintiffs state a claim that PIIC breached its contractual duties to provide coverage under the Policy in the face of a conflict of interest that required it to respond neutrally. *See Twombly*, 550 U.S. at 570. The Court thus denies PIIC's Motion as to this claim.

## I.     Claim Seven—Negligence/Negligent Supervision

In their seventh cause of action, Plaintiffs allege that PIIC breached its duty to use due care directly and in supervising its selected attorneys after the resignations of Gilbert and Matthesius in March 2023, and that PIIC's breach damaged AFLDS. (ECF No. 1 at 16.) PIIC further argues that Plaintiffs fail to specifically allege what conduct breached a duty of care, and that the Court should at least require Plaintiffs to file a more definite statement under Federal Rule of Civil Procedure 12(e). (ECF No. 6 at 12.) Plaintiffs argue that they have adequately pled this claim and that—to the extend PIIC was not actively directing its retained counsel, as pleaded in the alternative—it failed to ensure that such counsel consulted with all of its insured parties. (ECF No. 8 at 19.) The Court dismisses this claim with leave to amend for Plaintiff to clarify what duty of care it alleges that PIIC owed *with regard to the defense attorneys it funded in the Arizona Action* and what conduct breached that duty.

Plaintiffs may in theory plead a negligence claim in the alternative, but must be clear about the facts on which its negligence claim is predicated. *See, e.g., Ragonesi v. Gewico Cas. Co.*, Case No. 2:20-CV-1280-JCM-EJY, 2020 WL 7643225, at *5 (D. Nev. Dec. 23, 2020) (dismissing a negligence claim by an insured against an insurer because

it was primarily a recitation of legal elements and was duplicative of a bad faith claim, and emphasizing that **"**Nevada does not recognize a negligence claim by an insured against an insurer that is duplicative of a breach of contract or bad faith claim*"); Williams v. Travelers Home & Marine Ins. Co*., Case No. 2:16-cv-01856-APG-CWH, 2017 WL 937718, at \*4 (D. Nev. Mar. 8, 2017).

Here, it is unclear what duty of care, exactly, Plaintiffs allege that PIIC breached. In their opposition, Plaintiffs cite to allegations throughout the Complaint including that PIIC failed to investigate the actual officers and directors of AFLDS to determine from whom to take direction, failed to contact AFLDS's executive leadership, and ignored information about the Jenkins fraud. (ECF No. 8 at 19-20.) But these facts do not directly go towards the negligence allegations in claim seven, which address Plaintiffs' negligence *in relation to the defense attorneys* it funded at the Metzger firm. (ECF No. 1 at 16-17.) It is unclear whether and how Plaintiffs allege that PIIC—merely an insurer— owed a duty to Plaintiffs to oversee attorneys in a complex civil litigation. And to the extent that Plaintiffs' argument is that PIIC took an over-active role in legal decisions, this would seem to support a bad faith claim rather than a negligence or negligent supervision claim.

The Court thus dismisses this claim, but with leave to amend because it finds that Plaintiffs could plausibly state facts that clarify how PIIC breached a duty to Plaintiffs specifically through their interactions with defense attorneys. *See* Fed. R. Civ. P. 15. However, Plaintiffs are warned that negligence claims against insurers are limited in Nevada and to include only narrowly tailored facts in an amended claim. *See, e.g.*, *Williams v. Travelers Home & Marine Ins. Co*., 2017 WL 937718, at \*4.

### J.   Claims Eight and Nine—Injunctive and Declaratory Relief

Plaintiffs concede that injunctive relief is a remedy, rather than a cause of action. (ECF No. 8 at 20.) Accordingly, the Court dismisses Plaintiffs' eighth claim for temporary and permanent injunctive relief with prejudice as unopposed.

1    PIIC does not address Plaintiffs' final claim, for declaratory relief under 28 USC §
2    2201 and NRS § 30.030 *et seq*., in the Motion. It attempts to remedy its oversight in its
3    reply to Plaintiffs' opposition, pointing to arguments as to other claims and its general
4    position that dismissal is proper because control of AFLDS has not yet been determined
5    in the Arizona Action. (ECF No. 10 at 10.) The Court does not find this argument
6    persuasive. It thus denies the Motion as to Plaintiffs' declaratory relief claim (claim nine)
7    because PIIC did not properly move to dismiss this claim in its Motion.

8    **IV.    CONCLUSION**

9    The Court notes that the parties made several arguments and cited to several
10   cases not discussed above. The Court has reviewed these arguments and cases and
11   determines that they do not warrant discussion as they do not affect the outcome of the
12   Motion before the Court.

13   It is therefore ordered that PIIC's motion to dismiss (ECF No. 6) is granted in part
14   and denied in part. The motion to dismiss is granted with respect to Plaintiffs' claims for
15   aiding and abetting a tort (claim one); violations of NAC 686A.665 (claim two);
16   contractual and tortious breach of the implied covenant of good faith and fair dealing
17   (claims three and four); breach of fiduciary duty (claim five); negligence/negligent
18   supervision (claim seven); and temporary and permanent injunction (claim eight). The
19   motion is denied as to Plaintiffs' claims for breach of contract (claim six) and declaratory
20   relief (claim nine).

21   It is further ordered that Plaintiffs may file an amended complaint within 15 days
22   to correct the deficiencies identified in this order as to their claims for aiding and
23   abetting a tort (claim one); violations of NAC 686A.665 (claim two); contractual and
24   tortious breach of the implied covenant of good faith and fair dealing (claims three and
25   four); and negligence/negligent supervision (claim seven). Plaintiffs claims for breach of
26   fiduciary duty (claim five) and injunctive relief (claim eight) are dismissed with prejudice
27   and may not be amended. The Court grants leave to amend only as specified in this

28

order, and Plaintiffs may not assert additional claims in an amended complaint unless they comply with the Court's procedures for seeking additional relief.

It is further ordered that if Plaintiffs do not file an amended complaint, this action will proceed with Plaintiffs claims for breach of contract and declaratory relief, as alleged in the original complaint (ECF No. 1).

DATED THIS 26th Day of June 2024.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE